**STRYKER CORPORATION, Plaintiff,**

v.

**ZIMMER, INC. and Zimmer–Smoyer Associates, Inc., Defendants.**

**Civ. A. No. 84–2399.**

United States District Court,
D. New Jersey.

June 15, 1990.

Andora, Palmisano, Geaney & Romano by John F. Geaney, Jr., Elmwood Park, N.J., Morgan & Finnegan by John A. Diaz, Christopher A. Hughes, Robert E. Paulson, New York City, for plaintiff.

McCarter & English by Rosalie Burrows, Newark, N.J., Allegretti & Witcoff by D. Dennis Allegretti, Mark T. Banner, Jerry A. Riedinger, Chicago, Ill., for defendants.

## OPINION

BARRY, District Judge.

Among the host of motions now before me is plaintiff Stryker Corporation's motion for partial summary judgment holding

defendant Zimmer, Inc.'s patent infringement counterclaim barred under the doctrines of laches and equitable estoppel. I note that while the parties have once again inundated the court with papers, this opinion will be brief because the facts material to the issue before me are neither complex nor in dispute and because, given the imminent trial date, this opinion must issue immediately. For the reasons set forth below, and there being no conduct by Stryker which would preclude the application of laches and estoppel, Stryker's motion will be granted.

On June 4, 1974, Patent No. 3,813,699 (the "'699 patent") issued in the name of Richard P. Giliberty and four months later Giliberty granted an exclusive license of the patent to Zimmer. Zimmer's first hip-joint prosthesis made in accordance with the '699 patent was thereafter introduced with its patent marked on its prosthesis commencing in September 1976.

From at least as early as 1974 until 1984, Zimmer never asserted the '699 patent against anyone marketing a similar device although there were several devices on the market of which Zimmer knew and which it knew infringed its patent. Thus, for example, the Bateman prosthesis, continuously sold from 1973 until 1989 first by Meditec, then by 3M, and finally by the Kirschner Medical Corp. was believed by Zimmer from at least early 1975 to infringe its '699 patent yet that patent was not enforced against the Bateman prosthesis until January 1989—at least 15 years after the device was introduced on the market. It bears mention that in February 1974, Dr. Giliberty attended an exhibition and discussion of Meditec's Bateman prosthesis at an A.A. O.S. meeting and discussed his own prosthesis but said nothing about his pending '699 patent as to which he had received notice of allowability less than a month earlier and as to which the patent issued less than four months later.

As early as 1978, Zimmer knew that the Bi–Centric endoprosthesis introduced by Howmedica, Inc. in 1977 was infringing the '699 patent, yet not until 1989—11 years later—was Howmedica charged with infringement. Also in the mid to late 1970's, Medishield, Inc. marketed a prosthesis essentially identical to the Bateman prosthesis, and the '699 patent was never asserted against it. Certainly, throughout the years, if Zimmer's belated claim of infringement is believed, there was open and notorious infringement of the '699 patent. Certainly, too, Zimmer knew of the infringement throughout those years from Dr. Giliberty who complained of the Bateman, Howmedica and Medishield devices, and from its own patent attorney. *See* note 5, *infra*. At least six other companies, in the years after 1978, introduced bipolar prostheses, prostheses of which Zimmer was aware in the year of introduction, but against which it did not assert the '699 patent until January 1989.

In 1978–79, a company called Osteonics, relying on Zimmer's more than four years of inaction in failing to enforce the '699 patent against the Bateman and Howmedica prostheses, developed a bipolar endoprosthesis essentially the same as the Bateman, Howmedica & Giliberty devices. Osteonics was purchased by Stryker on August 1, 1979 [1]—5 years after the '699 patent issued and nothing had been heard—with a primary reason for the purchase being the commercial potential of the Osteonics device given Zimmer's years of silence in failing to enforce its patent. In early 1980, Stryker's Patent No. 4,241,463 the ('463 patent) issued and in March, 1980, —almost six years after the '699 patent issued—Stryker introduced its prosthesis, a prosthesis of which Zimmer almost immediately became aware.

Over the next four years, Stryker expended more than two million dollars, on top of the two million dollars it had spent

---

**1.** Mssrs. Knowaylo and Averill were the sole principals of Meditec and then joined 3M. Subsequently, Mr. Knowaylo left 3M and formed Osteonics where he was the sole principal until joined by Mr. Averill. Stryker's purchase of Osteonics has it arguing that all of the years of inaction by Zimmer vis-a-vis Meditec, 3M, and Osteonics preceding Stryker's purchase of Osteonics can be invoked by Stryker as inaction as to it, given that those companies were an embryonic form of Stryker. I need not pass on this embryonic form contention.

on the purchase of Osteonics, in developing facilities to manufacture and sell its device; sales increased from $680,000 in 1980 to $16,000,000 in 1984, sales of which Zimmer was aware; and Stryker became what Zimmer believed to be the market leader.

Thus, from at least as early as 1974 to 1984—ten years—the '699 patent was being openly and widely used in the industry with Zimmer's acquiescence, certainly permitting Stryker to conclude, as it did, that Zimmer had abandoned any rights in the patent. Indeed, in November 1981, Stryker warned Zimmer not to infringe the '463 patent with an Endolock device Zimmer had all but copied from the Osteonics device now asserted by Zimmer to be infringing. Zimmer, in response, stopped promotion of the Endolock device, thereby affirmatively indicating to Stryker that Stryker had the right to market its device. Not until more than two years following receipt of the letter of warning did Zimmer notify Stryker of the '699 patent much less notify Stryker of any intention to enforce that patent.

In June, 1984, Zimmer first moved to enforce its '699 patent against Stryker. During the period of time preceding and immediately following that act, several important witnesses died, most particularly Dr. Giliberty, the inventor of the '699 patent, and records and exhibits were lost or destroyed.[2]

■ Laches is an equitable defense which, if successful, bars recovery of damages for infringement which occurred prior to the filing of suit. The defense of estoppel, if successful, bars a patent owner from asserting its patent claim and, thus, bars an injunction or damages for infringement. *Jamesbury Corp. v. Litton Indus. Products, Inc.*, 839 F.2d 1544, 1551 (Fed.Cir.) *cert. denied*, 488 U.S. 828, 109 S.Ct. 80, 102 L.Ed.2d 57 (1988). The laches defense requires an unreasonable and inexcusable delay in the assertion of the claim and preju-

dice to the defendant resulting from the delay. *Id.* at 1552. The period of delay is measured from the date the patent owner "knew, or in the exercise of reasonable diligence should have known, of the alleged infringing activity" *id.*, here, March, 1980. While no specific period of time is required to make out laches, if the delay is six years or more, laches is presumed. *Id.*

■ The estoppel defense requires the same delay and prejudice and requires, as well, affirmative conduct by the patent owner inducing the belief that it has abandoned its patent claim against the alleged infringer and detrimental reliance by the alleged infringer. *Id.* at 1553–54. While silence alone is not sufficient to give rise to estoppel, intentionally misleading silence where "some evidence" exists to show that the silence was misleading enough to induce the alleged infringer to reasonably infer that the patentee has abandoned his patent claims will be sufficient. *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1573–74 (Fed.Cir.1987); *TWM Mfg. Co., Inc. v. Dura Corp.*, 592 F.2d 346, 350 (6th Cir.1979).

■ As the foregoing facts should make clear, Zimmer did nothing to enforce the '699 patent against Stryker for more than four years, remaining silent as Stryker built up its market and became what Zimmer believed to be the market leader with sales of $16,000,000 in the year Zimmer finally decided to capitalize on Stryker's success by moving to enforce the '699 patent. And, while I recognize that the applicable period for laches commenced in March, 1980 when Zimmer became aware of Stryker's prosthesis, the period for estoppel may well have commenced six years prior to that date when the industry-wide infringement began and Zimmer did nothing.[3] Certainly, when Zimmer received Stryker's warning letter in November, 1981, it could then have moved to enforce

---

**2.** In January, 1989, Zimmer advised 3M, Kirschner, Howmedica, and six other companies that they were infringing the '699 patent and that Zimmer intended to enforce the patent when this suit has been concluded.

**3.** With estoppel, delay is measured from the time of the misrepresentation or the beginning of the misleading silence. *Jamesbury Corp. v. Litton Indus. Products, Inc., supra*, 839 F.2d at 1554.

the '699 patent and did not do so until June, 1984, more than two and one-half years later. It is clear, at least to me, that Zimmer's delay in asserting its infringement claim against Stryker was both unreasonable and inexcusable.

Zimmer's arguments that its delay was not unreasonable and inexcusable are frivolous. First, and assuming that March 1980 is the triggering date, at least for purposes of laches, Zimmer attempts to nibble away at the four year delay to make that delay only three years and then argues that 30 months of that 36 month period were spent pursuing a reissue proceeding and, thus, should toll any purported period of delay. The nibbling argument simply does not fly.

■ First, conceding that it was in March 1980 when Zimmer knew Stryker's device had been introduced, Zimmer argues that the time period commences January 1981 when the first infringing sale was made. Unfortunately for Zimmer, $680,000 of sales were made in 1980. The nibbling continues with Zimmer arguing that it gave notice of infringement to Stryker in February 1984 and that date, not the date of suit, should control. Zimmer is wrong as a matter of law. Finally, Zimmer argues that the 30 month reissue proceeding it commenced in November 1981 should be excluded from any period of purported delay. Zimmer is again wrong as a matter of law. A patent owner's "other litigation" can only excuse—or toll—a period of delay if there was notice of the proceeding and of the patent owner's intention to enforce its patent when that proceeding concluded. *Jamesbury Corp. v. Litton Indus. Products, Inc., supra*, 839 F.2d at 1553; *Hottel Corp. v. Seaman Corp., supra*, 833 F.2d at 1573. Here, even if a reissue proceeding can be deemed "other litigation"[4], there

was no notice given Stryker of the proceeding and, *a fortiori*, no notice that Zimmer would enforce its patent when that proceeding concluded. Indeed, had Stryker known of the reissue proceeding, it could well have filed a protest or, in some other way, challenged patentability. Because there was no notice to Stryker, however, we will never know what the outcome of any such challenge would have been.

■ As noted earlier, Zimmer does not seriously argue that Stryker has not been prejudiced by the delay or that Stryker did not rely on Zimmer's conduct to its detriment, and evidence of both is manifest. Certainly, had Stryker known of the allegation of infringement, it would not have purchased Osteonics much less made continued capital investments. See *Jamesbury Corp. v. Litton Industrial Products, Inc., supra*, 839 F.2d at 1554–55. Certainly, too, Zimmer's claim of infringement at this late date would be to Stryker's "profound deteriment" because the result could be to jeopardize the business Stryker had developed relying on Zimmer's silence. *See MCV, Inc. v. King–Seeley Thermos Co.*, 870 F.2d 1568, 1574 (Fed.Cir.1989). As the Federal Circuit concluded in *MCV*, the district court correctly estopped MCV "in the face of its misleading nonchalance ..., a nonchalance on which [plaintiff] relied". *Id.* And, finally, important witnesses, records, and exhibits are, because of this "nonchalance", gone.

With reference to the fourth prong of the estoppel defense, *Hottel* notes that in the cases that have applied intentionally misleading silence in the patent infringement context, a patentee threatened immediate or vigorous enforcement of its patent rights but then did nothing for an unreasonably long time. 833 F.2d at 1574. "In

---

**4.** Involvement in other enforcement litigation may excuse a patentee's delay in suing an alleged infringer. *Jamesbury Corp., supra*, 839 F.2d at 1552 (citing cases). The Federal Circuit, in *Hottel*, specifically reserved decision on the question of whether a re-examination proceeding can be deemed "other litigation". This question, and the question before this court, seems to have been answered in the negative by the court which held, in *Jamesbury*, that a patentee's

involvement in litigation against one or more infringers may excuse delay in enforcing the patent against another infringer, if the infringer understands that the patentee is not acquiescing in the infringement. The reissue proceeding was not, of course, litigation against an infringer. Beyond that, Stryker could only have understood that Zimmer *was* acquiescing in the infringement.

infringement situations, an assertion of right followed by silence on the part of the patentee may give rise to an estoppel if the patentee's silence is sufficiently misleading 'to induce the alleged infringer to reasonably infer that the patentee has abandoned his patent claims' ". *MCV, Inc., v. King–Seeley Thermos Co., supra,* 870 F.2d at 1572 quoting *Jamesbury, supra,* 839 F.2d at 1554. Clearly, there were no threats and no assertion of rights here and thus, according to Zimmer, because the predicate is missing, the "intentionally misleading silence" cases should not apply. I disagree.

The function of a threat or an assertion of rights is not merely to evidence the patentee's knowledge of infringing activity but, for purposes of estoppel, to evidence inaction which, following a threat of enforcement or an assertion of rights, taints those threats or assertions as misrepresentations given the inaction which induced or misled the supposed infringer to believe that the patentee had abandoned its patent claims against the infringer. *See J.E. Ekornes Fabrikker A/S v. Charlton Co., Inc.,* 219 U.S.P.Q. 508, 515 (D.Mass.1982).

▮▮▮▮ But nowhere is it said that there *must* be a threat of enforcement or an assertion of rights followed by silence before there can be an estoppel. Indeed, where *nothing* has happened other than silence so misleading that the infringer believes the patentee has abandoned its claims, more reason exists for finding an estoppel than where a threat or an assertion of rights has, in fact, been explicated. A patentee who asserts its rights and then does nothing has at least initially put an alleged infringer on notice that something might be amiss which "something" it may, for whatever reason, not choose to pursue expeditiously. A patentee who, with knowledge of the alleged infringing activity, does nothing over a period of years other than mislead a purported infringer and those who have gone before to believe that there was and is no problem, lying in wait until, as Zimmer's counsel put it at oral argument, it has become "commercially and economically worthwhile" to do something (Tr. June 8, 1990 at 51), has engaged in affirmatively misleading silence of the worst order and should not be insulated merely because, for whatever reason, it did not articulate a threat or assert a right but, rather, chose to mislead from day one.[5]

Explicit threats and assertions of rights aside, intentionally misleading silence—so misleading here that it induced Stryker to "reasonably infer" and, indeed, to reasonably believe that Zimmer had abandoned its patent claims—is all over this case. A few examples will suffice: Dr. Giliberty's failure, as early as 1974, to even mention, as he viewed the Bateman device and heard the description of that device by the same individuals—Mssrs. Knowaylo and Averill—who years later sold Osteonics to Stryker, that the patent he had pending would be infringed by the Bateman device; knowledge by Zimmer over a period of ten years that the industry was infringing its patent yet failure by Zimmer to do anything waiting for the one pigeon as to whom it would be "commercially and economically worthwhile" to act;[6] failure by Zimmer even to respond to the 1981 warn-

---

5. The court asked counsel "What were you, Zimmer, doing since 1974. What were you doing for all those years? Waiting for someone to be commercially successful?" Counsel responded, "... [Y]ou do not assert a patent [u]nless it is commercially and economically worthwhile...." (*Id.* at 51). Then why, the court continued, did Zimmer not go after the concededly successful Bateman prosthesis as manufactured and marketed by Meditec, 3M, and Kirschner when Zimmer had consistently been told by Dr. Giliberty (who, I note, was in a licensee/licensor relationship with Zimmer) that that device was infringing. Counsel replied only that Zimmer *itself* never made that evaluation. *Id.* at 53. I reject this out of hand and

point, for starters, to Zimmer's letter of July 16, 1975 advising Dr. Giliberty that Zimmer's patent attorney had concluded that Meditec was infringing the '699 patent. (Stryker's Appendix to Laches and Estoppel motion, Exh. 4).

6. In *Stambler v. Diebold, Inc.,* 11 U.S.P.Q. 2d 1709, 1988 WL 95479 (E.D.N.Y.1988), *aff'd,* 878 F.2d 1445 (Fed.Cir.1989), a case which, as here, involved the plaintiff's silence in the face of ten years of industry-wide infringement, the court granted summary judgment under the estoppel doctrine.

*Plaintiff had a duty to speak out and his silence was affirmatively misleading. Plaintiff could not remain silent while an entire indus-*

ing letter concerning the Endolock device much less to assert the '699 patent in defense but, rather, immediately terminating all further promotion of the Endolock device, a device virtually identical to Stryker's '463 patent which is now alleged to infringe the '699 patent, thus affirmatively acknowledging Stryker's right to market its prosthesis without concern for the '699 patent and reinforcing the belief that the '699 patent had been abandoned.

It must be stressed that Zimmer knew precisely what Stryker was doing—as it had known during the six years prior to the introduction of Stryker's prosthesis what others were doing—and knew how successful Stryker had become. With such knowledge, as the *MCV* court put it, "it was incumbent upon [Zimmer] timely, explicitly and tenaciously to apprise [Stryker] of [the purported infringement] so it could be maturely considered. It is impermissible ... to lie low for four years and then invoke a claim ... against the patent when the matter could have been resolved from the start". *Id.* at 1573. Zimmer's intentionally misleading silence, silence the result, as counsel admits, albeit in different words, of a tactical decision to postpone litigation until there was a plum ripe enough to be plucked, i.e. until the sales of one of the many companies who supposedly infringed Zimmer's patent had increased so substantially as to render it worthy of suit, induced and unfairly misled Stryker into believing that Zimmer had abandoned its patent claims against everyone. This amounts to bad faith. *J.E. Ekornes Fabrikker A/S v. Charlton Company, Inc., supra,* 219 U.S. P.Q. at 515.

Zimmer unreasonably and inexcusably delayed in enforcing its patent against Stryker and Stryker was materially prejudiced by that delay. Moreover, Zimmer affirmatively misled Stryker into believing that Zimmer had abandoned its patent and Stryker relied to its detriment on this affirmatively misleading conduct. Stryker's motion for summary judgment barring Zimmer from enforcing the '699 patent

against Stryker under the doctrines of laches and estoppel will be granted.

The remaining motions can be disposed of summarily. In light of the disposition above, it is unnecessary to reach the merits of Zimmer's motion for entry of judgment of infringement of the '699 patent; Stryker's motion for partial summary judgment holding claims 5, 6, 7 and 10 of the '699 patent invalid under 35 U.S.C. §§ 102(a) and 103 based on the prior art Howse patent; and Stryker's motion for partial summary judgment holding claims 1, 2, 5, 6, 7 and 10 of the '699 patent invalid under 35 U.S.C. § 102(b) based on the prior art Richards prosthesis; and those motions are denied as moot. Similarly, Zimmer's motion to strike Stryker's laches and estoppel defenses and Zimmer's motion to strike Stryker's on sale/public use defense are denied as moot. Finally, Zimmer's motion for partial summary judgment of no liability as to its Endolock device is denied, it appearing that the Endolock device was virtually copied from Stryker's device with full knowledge of the '463 patent, copying which may well be evidential of willful infringement.

Counsel for Stryker shall submit an order reflecting this opinion within ten days of this date.

---

try implemented the proposed standard and then when the standards were adopted assert that his patent covered what manufacturers believe to be an open and available standard.

Furthermore, *plaintiff's silence could reasonably be interpreted as an indication that plaintiff had abandoned its patent claims.* 11 U.S. P.Q.2d at 1715. (Emphasis added).