ELECTROMOTIVE DIVISION OF GENERAL MOTORS CORPORATION, Plaintiff,

v.

TRANSPORTATION SYSTEMS DIVISION OF GENERAL ELECTRIC COMPANY, a New York corporation, and Daido Industrial Bearings, Ltd, a British corporation, Defendants.

No. 03–700940.

United States District Court,
E.D. Michigan,
Southern Division.

July 21, 2003.

John E. Nemazi, Ernie L. Brooks, Kevin J. Heinl, Thomas W. Cunningham, Brooks & Kushman, Southfield, MI, for plaintiff.

Anthony J. Rusciano, Plunkett & Cooney, Bloomfield Hills, MI, Arnold S. Weintraub, Weintraub Group, Farmington Hills, MI, for Transportation Systems Div., defendant.

William C. Schaefer, Driggers, Schultz, Troy, MI, for Daido Industrial Bearings, Ltd.

## OPINION AND ORDER

O'MEARA, District Judge.

Before the Court is Plaintiff's motion for preliminary injunction. Having reviewed and considered the parties' motions, briefs and supporting documents, and having further considered the oral arguments of counsel, the Court is now prepared to rule on this matter. For the following reasons, Plaintiff's motion for preliminary injunctive relief is denied.

## BACKGROUND FACTS

This is a patent infringement case. General Motors Corporation ("GM") has brought this suit against General Electric Company ("GE") and Daido Industrial Bearings, Ltd. ("Daido") for infringement of U.S. Patent No. 5,169,242 (the "'242 patent" or the "compressor bearing patent") applied for on November 27, 1990, and issued on December 8, 1992, and U.S. Patent No. 5,567,056 (the "'056 patent" or the "planetary bearing patent") applied for on September 29, 1994, and issued on October 22, 1996. The compressor bearing of the '242 patent is used in the GM's 710 turbocharger, and the planetary bearing of the '056 patent is used in both the GM's 710 turbocharger as well as the EMD 645 High Capacity turbocharger. GM seeks a preliminary injunction enjoining Defendants from infringing these patents by making, using, selling and offering for sale sleeve/stabilizing bearings covered by the '242 patent and planet bearings covered by the '056 patent.

After the issuance of each patent-in-suit, GM's Electromotive Division ("EMD") selected Daido to be its sole supplier of bearings covered by these patents. GM asserts that it recently discovered that Defendant GE's Transportation Systems Division ("GETS") is rebuilding EMD turbochargers using EMD's patented sleeve/stabilizing and planet bearings.[1] Specifically, GM claims that, in May 2002, EMD discovered infringing non-EMD sleeve/stabilizing bearings in a scrap bin at an EMD tear-down facility. According to GM, the infringing bearings are manufactured by Daido, EMD's own supplier. This is the gist of the factual background provided by GM.

By contrast, GE has filed a fifty page brief discussing the extensive factual history concerning these parties. The main point of this exhaustive background is that GM did not just "recently" discover the alleged infringing products but rather has known about—and acquiesced for years—in their creation by third parties. GE opposes GM's preliminary injunction on three main grounds: (1) equitable estoppel; (2) the on-sale bar pursuant to 35 U.S.C. § 102(b) and (3) preliminary injunctive relief not being warranted given the background of this controversy. (GE does not contest actual infringement—its sole

---

1. For clarity, GETS is a division of Defendant GE, and EMD is a division of Plaintiff GM. The parties use the terms interchangeably.

arguments deal with the invalidity of the respective patents because of equitable estoppel and the lack of urgency justifying preliminary injunctive relief.) As explained *infra*, because it is clear that we should deny preliminary injunctive relief based on equitable estoppel, we do not discuss the on-sale bar argument. We will have an opportunity to more fully analyze this argument when GE files its summary judgment motion, which it indicates will be forthcoming.

GE has filed sixty-nine exhibits. At the end of the rendition of facts, we discuss the exhibits which we find most important. While we do think GE overstates its case on how "open and notorious" the alleged infringement conduct was over the years, after reading the exhibits, we definitely feel that GM had at least constructive—if not actual—knowledge that third parties were infringing its patents. We further believe the evidence shows that GM made a strategic decision not to pursue its infringement claims at many times during the 1990s—only deciding to pursue them in 2002 when its main competitor (GE) acquired a third party resulting in a drastic change in the competitive scene.

EMD is the market leader in the manufacture of locomotives and turbochargers used in locomotive engines. EMD also remanufactures its turbochargers. The turbocharger has sleeve/stabilizing bearings (the '242 patent) and planet gear bearings (the '056 patent). These bearings wear out and are normally replaced when a turbocharger and diesel engine are repaired or rebuilt. Historically, EMD has provided such repair/rebuild service for its locomotives, and many railroads have pro-vided their own repair/rebuild service using genuine EMD repair parts obtained from EMD. GETS is EMD's top competitor in the locomotive engine industry.

Since at least the 1960s, third party remanufacturers have competed with EMD in the business of remanufacturing EMD turbochargers using reverse-engineered, EMD-compatible parts. The remanufacture of turbochargers involves the reuse of certain parts of the turbochargers (primarily the turbocharger core) and the replacement of other, expendable parts such as the compressor bearing and the planetary bearing. It is these bearings which are the subject of this patent infringement lawsuit.

GE explains that because of EMD's dominant market share in the early years of the locomotive market, the vast majority of the market for remanufacturing of locomotive turbochargers involves EMD engines. For years this market was supplied by the Original Equipment Manufacturer ("OEM"), in this instance EMD, and a variety of small suppliers. According to GE, the non-OEM suppliers of remanufacturing services obtain the replacement parts necessary to perform these remanufacturing services through reverse engineering where they obtain samples of the OEM part and create manufacturing drawings for these parts by measuring and essentially recreating the OEM part.

As explained by GE, one such non-OEM remanufacturer was Engine Systems Company ("Engine Systems") located in Latham, New York.[2] Engine Systems became and, according to GE, remained the lead-

---

2. Engine Systems was formed when a Morrison Knudsen subsidiary, MK Rail, acquired two former turbo remanufacturers, TMS and Arrowsmith Power Systems, and soon became EMD's principal competitor in the supply of remanufacturing services for EMD turbochargers. MK Rail later changed its name to Motive Power Industries and continued the business of remanufacturing EMD turbochargers in the Latham, New York facility using reverse-engineered parts. In 1999, MPI was acquired by WABTEC, and Engine Systems became a "Wabtec Company."

ing supplier of non-OEM turbocharger re-manufacturing services, principally for EMD turbochargers. GE asserts that Plaintiff EMD has long been fully aware of Engine Systems and its business. Indeed, as detailed by GE, EMD pursued business ventures with Engine Systems on three separate occasions throughout the 1990s.

First, in 1995, EMD and Engine Systems entered into negotiations for the sale of Engine Systems to EMD. According to GE, over the course of these negotiations, Engine Systems openly shared its engineering, manufacturing, sales, labor and employment, legal, and management information with individuals from EMD. Importantly, at no time during the 1995 talks did anyone from EMD mention any patented

bearings to Engine Systems or raise any other patent issues.[3]

Second, in 1997, EMD decided to enter into negotiations with Engine Systems to create a joint venture in the hopes of alleviating EMD's backlog of unfinished turbocharger refurbishment work. As recounted by GE, EMD visited Engine Systems' Latham facility twice and gathered extensive information about Engine Systems' business—including, according to GE, information about where Engine Systems acquired parts for its business of remanufacturing EMD's 645 and 710 turbochargers, including its compressor and planetary bearings.[4] Furthermore, as noted by GE, Dale Engelhardt, EMD's negotiation team leader, testified that EMD did

3. As highlighted by GE, EMD personnel involved in the 1995 talks repeatedly referenced in their notes that Engine Systems utilized reverse-engineered EMD parts. GE argues that, despite the fact that key EMD negotiators and due diligence personnel viewed EMD's patent (at that time only the '242 had issued) as potential leverage in the negotiations, and despite the fact that the parties were exchanging wide-ranging information, the specific patent was never revealed in any form to Engine Systems. The business venture never materialized due to unrelated environmental concerns. Nonetheless, as emphasized by GE, EMD still did not take action against Engine Systems or even question (as EMD characterizes it) the "open and notorious" conduct EMD now alleges infringed its patents. Consequently, GE explains that Engine Systems continued in its previous course of conduct by supplying remanufacturing services on EMD 710 turbochargers using reverse-engineered parts. GM vehemently counters that it monitored the market and did not find out about the infringement until 2002. As explained *infra*, however, the evidence illustrates that GM had at least constructive knowledge on several occasions that Engine Systems was violating its patents well before 2002.

4. GE points out that EMD's own internal documents reflect that it knew of Engine Systems' now-allegedly infringing conduct at

least by the mid-part of 1997. In the midst of the discussion between EMD and Engine Systems regarding Engine Systems becoming the exclusive supplier of turbo remanufacturing services for EMD, on August 5, 1997, Lynne Passett, who had been involved in marketing of EMD's aftermarket turbo remanufacturing services, wrote about the "leverage" she believed that EMD still had in its discussions with MPI (Engine Systems), as including: "710 parts and patents (I'm not convinced MPI has all of the answers they say they do)." (Exhibit 36.) Furthermore, as pointed out by GE, earlier documents authored during this same general time period variously refer to the 710 patents and their potential to "lock out" competition from Engine Systems (Exhibit 57), and the need for EMD to "leverage strengths now," including its strength in "patented parts." (Exhibit 58.) In an email authored on August 22, 1997, Ms. Passett advised various EMD managerial personnel, "we have reason to believe that MPI (old MK, TMS),( Arrowsmith) [Engine Systems] is in violation of our 710 turbo patents." (Exhibit 37.) Nonetheless, it is clear, as GE argues, that EMD never exercised this recognized "leverage" and never pursued its purported ability to "lock Engine Systems out," even when the discussions about a joint business relationship between EMD and Engine Systems ceased. As will be explained, GM made a strategic decision not to definitively find out if Engine Systems was violating its patents.

not consider the existence of the patents to be pertinent information that it should tell Engine Systems, despite their ongoing negotiations. GE also emphasizes that EMD offered to grant licences to unspecified 710 turbocharger patents as part of the overall agreement. Nonetheless, as before, the negotiated joint business relationship with Engine Systems never materialized, because, this time, EMD's labor unions would not agree with EMD's outsourcing of work to Engine Systems. Yet, despite the failed partnership, Engine Systems continued to stay in the 710 turbo remanufacturing business and, as emphasized by GE, EMD did nothing to enforce or even asserts its patent position against Engine Systems or any other competitors in the industry.

Finally, in late 1999 and 2000, EMD again engaged in discussions with Engine Systems about a potential joint venture relationship where Engine Systems would remanufacture turbochargers on EMD's account. Again, no relationship was consummated, and GE asserts that EMD did nothing to pursue the patent rights it now seeks to assert against GETS. According to GE, starting in 1999 and continuing into 2001, EMD began receiving information that GE was in discussions to acquire the Engine Systems' business. Yet, again, GE explains that EMD did nothing to assert the patent rights it now asserts in this litigation.

GE argues that, as a result of the due diligence performed by EMD on each of these three occasions, EMD was familiar with Engine Systems' business, including the very conduct that EMD now seeks to enjoin as an infringement of its patents. Specifically, GE explains that EMD tolerated and even encouraged Engine Systems' activities. GE asserts that EMD was acutely aware of Engine Systems' business in reverse engineering EMD's products throughout Engine Systems' lengthy existence, and EMD did nothing for years. In fact, GE emphasizes that EMD never once asked Engine Systems to cease its purported infringement. As GE correctly points out, EMD never marked its own products as patented (i.e. the ones that Engine Systems and others openly reverse engineered) nor indicated in any of its promotional materials the patent numbers. Rather, GE asserts that EMD through its actions, inaction and silence led Engine Systems to reasonably believe that either EMD had no patents or, if it had them, it had no intention of enforcing them. GE explains that Engine Systems reasonably relied on EMD's conduct in investing in and building its business around the remanufacture of EMD-style turbochargers.

GE argues that it likewise relied on EMD's estoppel conduct to its detriment. According to GE, while EMD repeatedly considered and examined an acquisition of Engine Systems, GETS actually consummated a transaction. Significantly, in November of 2001, GETS acquired the assets of Engine Systems from Westinghouse Air Brake . Technologies Corporation ("Wabtec") for approximately $240 million. GE emphasizes that, in that transaction, GETS secured an express representation and warranty from Wabtec and specific individuals affiliated with the company (including importantly, the former President of Engine Systems, James E. Lindsay) that "no Person has asserted, nor does any Seller Party have any Knowledge that, any Seller Party or a licensee of a Seller Party is infringing or has infringed any domestic or foreign patent."[5] Mr. Lindsay provided

---

**5.** As explained by GE, Mr. Lindsay has had a long history on both sides of this controversy. Mr. Lindsay, a former and now current employee of EMD, played a critical role in En-

gine Systems prior to its acquisition by GE. Mr. Lindsay was employed at EMD from 1978 to 1989, last holding the position of Parts Marketing Specialist for aftermarket turbo-

this warranty because EMD never asserted any specific patent rights, although he had previously asked EMD for information about patents.[6]

Finally, GE explains that co-Defendant Daido also relied on EMD's estoppel conduct.[7] According to GE, even though EMD knew at the time it first contracted with Daido for the supply of EMD turbocharger parts that Daido had already been supplying EMD-compatible turbo parts to non-OEM suppliers for some time, EMD never alerted Daido that the parts it was requesting Daido to supply were patented, or that non-OEM versions of such parts could not be provided for any other reason. Moreover, GE emphasizes that EMD never marked the parts or drawings with any indication that the parts were patented. Therefore, GE asserts that EMD's silence in the face of its obligation to speak (particularly given EMD's knowledge of Daido's preexisting relationship with non-OEM suppliers), and Daido's resulting reasonable, detrimental reliance, preclude EMD's suit against Daido (and GETS) now.

GE argues that we should deny GM's request for preliminary injunctive relief on three grounds: (1) Based on EMD's misleading conduct, and Engine Systems, GE and Daido's reasonable reliance thereon, EMD should be equitably estopped from seeking to enjoin the continued operation of Engine Systems' turbo remanufacturing business, including specifically the conduct that EMD now asserts violates its patents; (2) EMD's patent claims are invalid and unenforceable under 35 U.S.C. § 102(b) in that EMD's bearings were on-sale more than one year prior to EMD's filing of its patent applications; and (3) EMD's claim of irreparable harm is precluded by its lengthy delay in instituting this action and the availability of money damages.[8]

GM counters that EMD only discovered GETS' allegedly infringing bearings when Mr. Duve picked the parts out of the scrap

---

charger parts. Mr. Lindsay left EMD in 1989 and commenced employment with Arrowsmith. When Arrowsmith was acquired by MK Rail in 1993, Mr. Lindsay became employed with Engine Systems Company and became its President. Mr. Lindsay continued in a managerial role with Engine Systems throughout its various corporate iterations until the GETS' acquisition in 2001, at which time he again became employed with EMD.

6. The following excerpt from Mr. Lindsay's deposition shows that GMEMD did not inform Engine Systems of its potential infringement:

> Q. So, as I understand your testimony, sir, you—there was general discussions or references made to patents, but no one from EMD ever told you which parts, if any, were patented in the 710 turbocharger; is that correct?
> A. That's correct.
> Q. That is information that you wanted from them; isn't that true?
> A. If they would have specifically told me these are patented, yes, that would have been useful to me.

> Q. And that's because it was important information for you to know to be able to make business decisions in your business; isn't that true?
> A. Yes.
> Q. And if they told you that the parts were patented, then you would have addressed that issue and tried to avoid infringing on those patents; correct?
> A. Yes.
> Q. But because they didn't tell you which parts were patented, there is nothing you could do about it; is that your testimony?
> A. Yes.

(Exhibit 5, Lindsay Dep. at pp. 168:3 –169:3).

7. Daido did not file its own brief in opposition to the preliminary injunction motion. Rather, Daido states that it relies and adopts the detailed brief filed by GE in opposition to the preliminary injunction motion.

8. GE also asserts that EMD's failure to timely pursue its rights has not only resulted in economic prejudice but also evidentiary prejudice in that documents have been destroyed and witnesses have become unavailable.

pile at EMD's tear-down facility in May 2002. GM explains that, although it expended reasonable efforts, it did not know about the infringement by GE's predecessors (i.e. Engine Systems) at anytime before 2002. GM claims that it prudently monitored the landscape throughout the 1990s and on four occasions (one each in 1993, 1995, 1997, and 2002) tore down turbochargers rebuilt by GM's competitors in search of infringing patents, yet—until 2002—only found its own OEM parts. GE opines that it is not the presence of the alleged infringement which has motivated GM in this lawsuit but rather the identity of the alleged infringer (GETS—as GM's largest competitor—instead of Engine Systems). Even so, GE argues that it still took GM another seven months (after Mr. Duve's "discovery" in the trash) to file this lawsuit against GETS and its own supplier, Daido.

The Court has read the pertinent exhibits and wants to highlight the ones that its believes illustrate that GM made a strategic decision not to adequately and thoroughly investigate whether Engine Systems was infringing EMD's patents, despite having at least constructive knowledge that infringement was occurring. Despite GE's protestations to the contrary, we do not believe that GM, with 100 percent certainty, knew that infringement was occurring in the 1990s. Rather, we believe that GM–EMD had a strong hunch that Engine Systems was infringing its patents but chose for strategic and financial reasons not confirm infringement in the 1990s. We also want to emphasize that the evidence shows that Mr. Lindsay, President of Engine Systems in the 1990s (and now a current EMD employee), tried to find out during the 1997 business negotiations if Engine Systems was violating

any of GM's patents. Yet, GM strategically did not provide an answer to his questions.

— *Exhibit 12, Eric Duve's* [9] *deposition:* According to Mr. Duve's testimony, during the 1997 negotiations between Engine Systems and GM, Mr. Lindsay (as President of Engine Systems) specifically inquired about GM's "710 patents" and said that Engine Systems had "ways around it" (p. 65–66). Mr. Duve stated that his boss, Jim Heilenbach, merely responded "oh" (p. 67). Yet, despite having Mr. Lindsay's questions about GM's patents in 1997, GM did not pursue its patent rights until this litigation when GE acquired Engine Systems. Furthermore, in 1999, Mr. Duve confirmed that EMD had suspicions about possible infringement because it was losing business (p. 61–62), but again, EMD did not attempt to obtain a competitive turbo to verify whether infringement was occurring. Mr. Duve admitted that EMD could have obtained a competitive turbo at that time but did not (p. 62). Mr. Duve also admitted that "budget constraints" prevented EMD from verifying whether Engine Systems was infringing on EMD's patents in 1997 (p. 162).

— *Exhibit 37, August 22, 1997 email from Ms. Passett (GM employee):* Here, Ms. Passett advised various EMD managerial personnel, "we have reason to believe that MPI (old MK, TMS, Arrowsmith) is in violation of our 710 turbo patents." Then, Ms. Passett discusses "caveats" about tearing down an Engine Systems' 710 turbocharger to confirm whether infringement is going on. In other words, this email dated 1997 shows that EMD had actual knowledge that Engine Systems may be violating its patents. Yet, EMD chose not to confirm whether infringement

---

**9.** Mr. Duve is a senior project engineer for EMD and played a role in the 1997 negotiations with Engine Systems.

was occurring and did not answer Mr. Lindsay's questions about the 710 turbocharger patents.

— *Exhibit 6, Lynne Passett's deposition testimony:* Here, Ms. Passett testified (pp. 186–87) that she received an email on August 5, 1997 stating that Mr. Lindsay had stated that he had "gotten around [GM's] patents." Yet, again, Ms. Passett confirmed that no one from GM did anything about Mr. Lindsay's assertions or inform Mr. Lindsay that GM did have patents for certain bearings relating to the 710 turbocharger and that GM would enforce its patent rights. Later on, Ms. Passett confirmed that she felt that GM had "leverage" in the current business negotiations because of the 710 patents (p. 191). *Significantly, Ms. Passett admitted that, in August 1997, Mr. Lindsay had asked what parts of the 710 turbocharger were patented to make sure he did not inadvertently do something he should not be doing* (pp. 213–214, 219). (*See also* Exhibit 11, August 22, 1997 email where Ms. Passett wrote that Lindsay inquired about the patents.) Yet, again GM never provided him an answer (p. 228). Ms. Passett speculated that, perhaps, GM never answered Mr. Lindsay's question because he was a competitor (p. 219). Furthermore, GM concluded that having Engine Systems be in violation of a patent would given them considerable leverage in the partnership negotiations (p. 221). Yet, Ms. Passett stated that GM never had proof that Engine Systems was infringing (p. 222). When asked why GM did not ask Mr. Lindsay about infringement or acquire a turbocharger and check for infringement, Ms. Passett stated that it was difficult to confirm infringement (p. 222). In fact, later on, Ms. Passett explained that there was a "cost" to confirming whether Engine Systems was violating EMD's patents (pp. 230–33). By having a customer act in a sting operation to obtain a turbocharger with the alleged infringing parts,

EMD would he highlighting to that customer that Engine Systems was selling at a lower cost. Ms. Passett explains that EMD was worried about losing that customer to Engine Systems (p. 230–31). In other words, Ms. Passett agreed that it was not worth it to EMD to find out about alleged infringement by Engine Systems because it could cost EMD a customer (p. 231).

— *Exhibit 5, Jim Lindsay's deposition:* Here, Mr. Lindsay confirms that he tried to find out during the 1997 negotiations from GM–EMD if Engine Systems was violating any of 710 turbocharger patents (p. 168). Mr. Lindsay testified that in August 1997 (and as of July 2001 when he became an EMD employee) he was not aware of there being any patents on EMD's 710 turbocharger (p. 172)—despite his having inquired (unsuccessfully) about whether Engine Systems was in violation of any patents (p. 176).

— *Exhibit 12, Dale Engenhardt's deposition:* Mr. Engenhardt confirmed that EMD could have taken steps to acquire and disassemble an Engine Systems' remanufactured 710 turbocharger in the 1990s to see if there was any infringement (p. 249).

## LAW AND ANALYSIS

■ 35 U.S.C. § 283 empowers us to grant injunctions under principles of equity to "prevent the violation of any rights secured by patent, on such terms as the court deems reasonable." In patent cases, courts evaluate motions for a preliminary injunction in accordance with a four-part test:

a. Whether the moving party is likely to succeed on the merits;

b. Whether the moving party will suffer irreparable harm if a preliminary injunction is not granted;

c. Whether the balance of hardships tips in favor of the moving party or the opponent; and

d. Whether the grant of a preliminary injunction will adversely affect the public interest.

*High Tech Medical Instrumentation, Inc. v. New Image Indus.*, 49 F.3d 1551, 1553 (Fed.Cir.1995).[10]

■ "[A]t the preliminary injunction stage, because of the extraordinary nature of the relief, the ***patentee*** carries the burden of showing likelihood of success on the merits with respect to the patent's validity, enforceability, and infringement." *Nutrition 21 v. United States*, 930 F.2d 867, 869 (Fed.Cir.1991) (*emphasis in original*). A patentee meets this burden by clearly showing that the patent in suit is both valid and infringed and that the remaining equities balance in favor of granting a preliminary injunction. *Id.* at 870. "[A] preliminary injunction is not to be routinely granted." *High Tech Med. Instrumentation*, 49 F.3d at 1554 (citation omitted).

Here, we do not believe that the patentee (in this case GMEMD) has carried its burden of likelihood of success on the merits as well as why the equities balance in favor of granting preliminary injunctive relief. While GE has essentially conceded infringement, it argues that EMD will not likely succeed on the merits because its patent claims are barred by equitable estoppel. (In other words, that the patent is unenforceable.) We think there is strong evidence that supports an equitable estoppel theory here.

■ "Estoppel is an equitable defense to a charge of patent infringement and, if proven, may entirely bar an infringement suit." *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1063 (Fed.

Cir.1995); *Adelberg Laboratories, Inc. v. Miles, Inc.*, 921 F.2d 1267 1272–73 (Fed. Cir.1990). In other words, if the defense of equitable estoppel is successful, the patents are unenforceable as against the alleged infringer.

■ There are three elements to an estoppel claim:

(1) the patentee, through misleading conduct, leads the alleged infringer to reasonably infer that it does not intend to enforce the patent against the alleged infringer;

(2) the alleged infringer relies upon the patentee's conduct;

(3) due to the reliance, the alleged infringer will be materially prejudiced if the patentee is permitted to proceed with its infringement suit.

*ABB Robotics*, 52 F.3d at 1063. With respect to prong one, the conduct may include specific statements, action, inaction, or silence where there was an obligation to speak. *Id.; see also Broomall Industries v. Data Design Logic Systems*, 786 F.2d 401, 406 (Fed.Cir.1986) (finding that the nature of the affirmative conduct that estoppel requires includes misrepresentations, affirmative acts of misconduct, or intentionally misleading silence by the patentee). While silence alone is not sufficient to give rise to estoppel, intentionally misleading silence where "some evidence" exists to show that the silence was misleading enough to induce the alleged infringer to reasonably infer that the patentee has abandoned his patent claims will be sufficient. *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1573–74 (Fed.Cir.1987).

■ Here, we believe that GE has submitted ample evidence of misleading conduct by EMD that lulled Daido, Engine Systems, and GE (as a bona fide purchas-

---

**10.** The standards applied to the grant of a preliminary injunction are no more or less stringent in patent cases than in other areas of the law. *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 387 (Fed.Cir.1987).

er) into reasonably believing that EMD did not intend to enforce its patents. Mr. Lindsay, Engine Systems' President at the time, specifically told EMD he was unaware of any EMD patents, and asked EMD to identify any patents so that pre-GE Engine Systems could avoid any inadvertent infringement. Yet, EMD never responded to Mr. Lindsay nor did EMD advise Engine Systems about the patents it now asks this Court to enforce on an emergency basis.[11]

As GE points out, the case of *Scholle Corp. v. Blackhawk Molding Co., Inc.*, 133 F.3d 1469 (Fed.Cir.1998) is particularly on point with the facts of the case *sub judice*. In *Scholle Corp.*, the plaintiff knew of the defendant's allegedly infringing device for three and half years prior to filing suit because the alleged infringer told the patentee that it was "designing alternatives" to the patent at issue. *Id.* at 1470–71. Over the course of that period, the alleged infringer's sales and marketing of the allegedly infringing device were open and notorious and sales increased. *Id.* The patentee never threatened suit or otherwise raised the issue of infringement despite the fact that the parties were in regular, ongoing contact and the plaintiff knew about the development and sales of the allegedly infringing device. *Id.* In fact—similar to the situation here—the parties even discussed a merger of the two companies during this time. *Id.* "Yet, in all this time and throughout these discussions, [the patentee] made no suggestion that it might consider the [device] to infringe the '354 patent." *Id.* at 1471. Sig-

nificantly, the *Scholle* court ruled that the patentee's silence in these circumstances constituted misleading conduct which satisfied the first element of the equitable estoppel defense:

> [W]hen the course of dealings between the patentee and an alleged infringer is such that the alleged infringer reasonably infers from the patentee's misleading conduct or inaction that the patentee has waived its patent rights, then the first element of equitable estoppel has been established absent a statement to the contrary.

*Id.* at 1472.

Furthermore, the case of *Stryker Corp. v. Zimmer, Inc.*, 741 F.Supp. 509 (D.N.J. 1990) is also instructive. In *Stryker*, the court estopped the patentee based on its silence in the face of open and notorious "infringement," where the patentee met with the alleged infringer repeatedly over the course of years and was well aware of its allegedly infringing activities. In *Stryker*, as is here, there was no initial assertion of patent rights. Yet, the *Stryker* court specifically found the patentee's silence constituted misleading conduct:

> A patentee who asserts its rights and then does nothing has at least initially put an alleged infringer on notice that something might be amiss which "something" it may, for whatever reason, not choose to pursue expeditiously. *A patentee who, with knowledge of the alleged infringing activity, does nothing over a period of years other than mislead a purported infringer and those who have gone before to believe that*

11. As GE emphasizes, EMD never marked its bearings (though it did put its product number on the bearings), leaving its supplier and the entire reverse-engineering industry completely unaware EMD laid any claim to proprietary rights. GE also points out that EMD failed to notify Daido and the industry of its patents in any other fashion—through sales brochures, publications, or even marking the

outside of its turbocharger. While EMD argues that there is no obligation to mark its products (which is true, *see* 35 U.S.C. § 287(a), stating that a patentee *"may* give notice ... by fixing ... a patent"), considering EMD's silence when directly asked about its patents, it does seem that EMD purposely (and strategically) misled Engine Systems and its own supplier Daido about its patents.

*there was and is no problem, lying in wait until,* as [the patentee's] counsel put it at oral argument, *it has become "commercially and economically worthwhile" to do something,* has engaged in affirmatively misleading silence of the worst order and should not be insulated merely because, for whatever reason, it did not articulate a threat or assert a right but, rather, chose to mislead from day one.

*Id.* at 514 (emphasis added). In granting summary judgment based on equitable estoppel, the court further noted;

[The patentee's] intentionally misleading silence, silence the result, as counsel admits, albeit in different words, *of a tactical decision to postpone litigation until there was a plum ripe enough to be plucked,* i.e. until the sales of the one of the many companies who supposedly infringed Zimmer's patent had increased so substantially as to render it worthy of suit, *induced and unfairly misled Stryker into believing that [the patentee] had abandoned its claims against everyone.*

*Id.* at 515 (emphasis added).

As was the case in both *Scholle* and *Stryker,* we believe that there is evidence that EMD misled Daido, Engine Systems, and GE into believing that the reverse engineering of the EMD turbochargers in general, and·the reverse engineering of the compression and planetary bearings in particular, could be continued without fear of infringing upon any EMD patents. While we do not believe the evidence suggests—as GE unequivocally asserts—that Engine Systems' conduct was "open and notorious" and that EMD definitively knew that infringement was occurring and

turned a blind eye, we believe that, instead, EMD had ample evidence of supposed infringement from its own due diligence during the 1995, 1997 and 1999 negotiations as well as Mr. Lindsay's questions regarding the existence of any patents, and strategically decided (1) not to confirm whether infringement was occurring because it would be too expensive and (2) not to truthfully answer Mr. Lindsay's questions about possible infringement, choosing instead the strategy of silence in order to obtain an upper hand in negotiations.[12] Now, after GETS has acquired Engine Systems and, in essence, it has become worthwhile to enforce its patents, EMD wants preliminary injunctive relief. The Court finds that based on *Scholle* and *Stryker* we have a classic case of equitable estoppel.

Furthermore, cases have held that constructive knowledge may be imputed to a patentee who tries to justify its delay by citing its lack of definitive, affirmative knowledge that the defendant is infringing. *See Wanlass v. General Electric Co.,* 148 F.3d 1334, 1338 (Fed.Cir.1998) (stating "sales, marketing, publication, or public use of a product similar to or embodying technology similar to the patented invention, or published descriptions of defendant's potentially infringing activities, gives rise to a duty to investigate whether there is infringement"). "Furthermore, constructive knowledge of the infringement may be imputed to the patentee even where he has no knowledge of the sales, marketing, publication, public use, or other conspicuous activities of potential infringement if these activities are sufficiently prevalent in the inventor's field of endeavor." *Id.*[13]

---

**12.** In addition, as GE notes, even after each deal failed, EMD never notified Engine Systems about its patents, further misleading Engine Systems in its belief that EMD would not disturb its business or assert any patent infringement claims against it.

**13.** GM–EMD tries to differentiate *Wanlass* by the fact that it concerned the doctrine of

Based on the 1995, 1997 and 1999 negotiations between Engine Systems and EMD, especially Mr. Lindsay's specific inquiries about the 720 turbocharger patents, it is clear that—at a minimum— EMD had constructive knowledge of the infringement. In fact, the evidence shows that EMD made a strategic decision not to confirm whether infringement was occurring. We do not believe EMD should be allowed to blindly ignore possible infringement, only to request the extraordinary relief of a preliminary injunction at a time of its choosing.

We also believe that the second element of equitable estoppel (i.e. reliance) has been adequately established. The second element of the equitable estoppel defense requires that the alleged infringer rely upon the patentee's misleading conduct. *ABB Robotics,* 52 F.3d at 1064. Evidence that the alleged infringer grew or acquired a business which was based on the allegedly infringing device can be used to show reliance. *See Adelberg Laboratories,* 921 F.2d at 1274 (finding reliance where alleged infringer "built up its clamp business in reliance" on the patentee's misleading conduct). In the case at bar, it is clear that GE has established reliance. It would not have presumably purchased Wabtec (Engine Systems) in 2001 for $240 million if it knew that it would be infringing on EMD's patents. In fact, Mr. Lindsay testified that had EMD informed him of the patents at issue in this case, he would not have specifically and personally represented and warranted to GE, in the 2001 acquisition agreements, that the pre-GE Engine Systems did not have any existing or potential patent infringement problems. Furthermore, Daido similarly relied on EMD's misleading silence to continue to work closely with non-OEM manufacturers

like Engine Systems in the manufacture of reverse-engineered parts.

There is also evidence that the third element of equitable estoppel (i.e. material prejudice) is established. The final element of estoppel is a showing by the defendant that it "would be materially prejudiced if the patentee is now permitted to proceed. As with laches, the prejudice may be a change of economic position or loss of evidence."*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1043 (Fed.Cir.1992) (in banc). Economic prejudice consists of damages or the loss of monetary investments that likely would have been prevented by earlier suit. *Id.* at 1033. Evidentiary prejudice consists of harm to the defendant's ability to present a full and fair defense on the merits by reason of loss of records, the death of witnesses, or the fading of memories, thereby undermining the court's ability to judge the facts. *Id.* Here, as explained by GE, we have both.

As explained *supra,* in 2001, GE, in reliance on the express representation by Engine Systems that its business was not infringing any patent, invested over $200 million to purchase a business that specialized in servicing EMD turbochargers with reverse-engineering products. Furthermore, with respect to evidentiary prejudice, GE posits that because the time period at issue spans almost a decade and includes so many corporate changes at Engine Systems, and because GE only acquired Engine Systems in 2001, obtaining relevant documents and testimony is extremely difficult or simply not possible for GE. In addition, GE asserts that the effective litigation efforts of both GE and Daido are also significantly hampered by the fact that the President of Engine Systems during the critical time period, James Lind-

laches (and not equitable estoppel). While this is true, there is no reason why the same

rationale would not equally apply to equitable estoppel.

say, is now employed by the Plaintiff EMD. This is a good point. Finally, GE points out that current EMD employees Dale Engelhardt, James Lindsay and Lynne Passett, who all played a key roles in the 1995, 1997 and 1999 negotiations between EMD and pre-GE Engine Systems, repeatedly testified that they could not remember what was known or discussed between by EMD and Engine Systems. In sum, GE has established the final prong of equitable estoppel: material prejudice.

■ GM responds by arguing that equitable estoppel does not apply in this case because Engine Systems was not aware of EMD's patents. According to GM, the patent and the infringement must be known on both sides for estoppel to apply. GM cites *A.C. Aukerman Co.* for this proposition:

> The first element of equitable estoppel concerns the statements or conduct of the patentee which must "communicate something in a misleading way." The "something" . . . is that the accused infringer will not be disturbed by the plaintiff patentee in the activities in which the former is currently engaged. The patentee's conduct must have supported an inference that the patentee did not intend to press an infringement claim against the alleged infringer. *It is clear, thus, that for equitable estoppel the alleged infringer cannot be unaware—as is possible under laches—of the patentee and/or its patent.* The alleged infringer also must know or reasonably be able to infer that the patentee has known of the former's activities for some time.

960 F.2d at 1041(emphasis added).

With all due respect to GM, we do not believe the language emphasized above means that the alleged infringer must know with 100 percent certainty that infringement is definitely occurring—independent of any misleading conduct by the patentee. In the case *sub judice,* Engine Systems President James Lindsay tried to find out about EMD's patents but was met with affirmative silence. While it is true—as GM asserts—that Mr. Lindsay and Engine Systems could have performed a patent search to see if they were violating any patents, based on the evidence of record, it is clear that EMD actively misled Mr. Lindsay (who ironically is now an EMD employee) and Engine Systems about the existence and importance of its patents. Despite the verbatim language quoted above, we do not think *A.C. Aukerman* stands for the proposition that if a person tries to find out about a patent (to see if he is inadvertently infringing) and is met with silence, and the other behavior of the patentee suggests that it will not enforce its patents (or that there is no infringement), equitable estoppel cannot apply unless the alleged infringer knows with 100 percent certainty that he is infringing on a known patent. Such a reading of *A.C. Aukerman* does not make much sense and is not consistent with the rest of the case law.

Because GE will probably prevail on its equitable estoppel argument, GM will not likely succeed on the merits of its patent infringement case. Furthermore, as GE emphasizes, we are skeptical that irreparable harm (the second prong of the preliminary injunction analysis) will occur if we do nothing right now and GM ultimately prevails. After all, GM–EMD did not aggressively protect its patents against competitors for the last decade. Undue delay in seeking an injunction "is an important factor bearing on the need for a preliminary injunction." *High Tech Med. Instrumentation v. New Image Ind.,* 49 F.3d 1551, 1557 (Fed.Cir.1995) (citing cases). As described *supra,* EMD suspected, no later than 1997, that Engine Systems was reverse-engineering the specific patented turbocharger parts at issue but failed to

act. As pointed out by GE, EMD's decision to delay its case for *years*—not just months—mitigates heavily against any finding that it will be irreparably harmed by waiting for a full trial on the merits of its claims. While GM–EMD is obviously more concerned about the market power of a formidable opponent GETS (as opposed to pre-GE Engine Systems), this does not change the fact that EMD is not entitled to any presumption of irreparable harm. *See Nutrition 21,* 930 F.2d at 871 ("[W]ithout a clear showing of validity and infringement, a *presumption* of irreparable harm does not arise in a preliminary injunction proceeding.") (emphasis in original).

In sum, because GM cannot establish the first two prongs justifying preliminary injunctive relief, namely likelihood of success on the merits and irreparable harm, we deny its motion for preliminary injunctive relief.

### ORDER

It is hereby **ORDERED** that Plaintiff's motion for preliminary injunction is **DENIED**.