SCHOLLE CORPORATION,
Plaintiff–Appellant,

v.

BLACKHAWK MOLDING CO.,
INC., Defendant–Appellee.

No. 97–1358.

United States Court of Appeals,
Federal Circuit.

Jan. 15, 1998.

Edward F. O'Connor, Oppenheimer Poms Smith, Irvine, CA, argued for plaintiff-appellant.

David I. Roche, Baker & McKenzie, Chicago, IL, argued for defendant-appellee. With him on the brief was Michael A. Pollard. Of counsel were David C. Doyle and Laura L. Peterson, San Diego, CA.

Before NEWMAN, Circuit Judge, ARCHER, Senior Circuit Judge,* and MICHEL, Circuit Judge.

* Senior Circuit Judge Glenn L. Archer, Jr. vacated the position of Chief Judge on December 24, 1997.

MICHEL, Circuit Judge.

Scholle Corporation ("Scholle") appeals the March 17, 1997, decision of the United States District Court for the Central District of California granting summary judgment to Blackhawk Molding Co., Inc. ("Blackhawk"). *Scholle Corp. v. Blackhawk Molding Co., Inc.*, No. SA CV 96–0174–GLT(EEx) (C.D.Cal. Mar. 17, 1997). This case was submitted for our decision following oral argument on December 3, 1997. Because it was not an abuse of discretion for the district court to determine that, given the course of dealings between the parties, Scholle's infringement claim against Blackhawk was barred under the doctrine of equitable estoppel, we affirm.

## BACKGROUND

This case concerns valved bottle caps used on five-gallon water bottles. Such water bottles are the type found inverted on the top of water coolers that are typically located in offices and factories. Blackhawk first began selling valved water bottle caps in 1989 and is one of the two principal manufacturers of this product. The other leading manufacturer is Portola Packaging, Inc., formerly known as Cap Snap Co. ("Cap Snap"). Blackhawk initially sold its caps by means of a royalty licensing agreement with Elkay Manufacturing Co. ("Elkay"), a manufacturer of water coolers, whereby Elkay sold a complete "hygienic" or "non-spill" system in which the cap remained on the bottle while it was lowered onto the cooler. The valve on the cap, known as the WATERSAFE™ cap, was then opened by a probe on the cooler. Previous products had required removal of the cap before inversion onto the cooler which led to unwanted splashing and spillage.

Scholle is the assignee of United States Patent No. Re. 32,354, reissued February 17, 1987 (the " '354 patent"). The '354 patent, entitled "Container For Holding And Dispensing Fluid," describes a moveable probe that can be inserted by hand into a special fitting to extract liquid from a type of container known as a "bag-in-the-box" container.

On December 16, 1991, Scholle sent a letter to Blackhawk accusing the WATERSAFE™ cap of infringing the '354 patent

under the doctrine of equivalents and demanding that Blackhawk cease and desist from further sales of the cap. This was one of several letters that Scholle sent to a number of companies, including Cap Snap, that Scholle believed to be infringing the '354 patent. Elkay's counsel, as counsel to Blackhawk's indemnitor under the licensing agreement, wrote twice to Scholle requesting that Scholle identify the claims alleged to be infringed. Scholle refused to respond with any such details. On July 2, 1992, Scholle filed a complaint against Cap Snap and subsequently obtained a jury verdict on February 24, 1995, finding that Cap Snap had infringed the '354 patent and that the patent was not invalid for obviousness or by anticipation.

Meanwhile, in late 1991, Blackhawk started working on designing alternatives to the WATERSAFE™ cap and in October 1992 it filed a patent application on an invention that was later marketed as the SAFEGARD™ cap. The SAFEGARD™ cap differs from the WATERSAFE™ cap primarily because it uses an inner cap, rather than a plug, to connect to the probe and tube of the cap. United States Patent No. 5,392,939 issued on February 28, 1995, and claimed the invention embodied by the SAFEGARD™ cap.

Blackhawk commenced selling the SAFEGARD™ cap in February 1993. In April 1993, at a meeting in suburban Chicago, Blackhawk's Chairman and President presented samples of the SAFEGARD™ cap to Scholle's CEO and informed him that they considered the new cap to be outside the scope of the '354 patent and that they intended to market the new cap. Blackhawk's Chairman also informed Scholle that Blackhawk would consider the new product noninfringing unless Scholle advised Blackhawk otherwise. The samples were later forwarded to Scholle's Chairman and, by July 1993, both Scholle's patent counsel and the inventor of the '354 patent were aware of the SAFEGARD™ cap. However, Scholle offered no response to Blackhawk's inquiry.

Scholle and Blackhawk had numerous contacts among high-level corporate officials be-

tween the 1993 Chicago meeting and February 22, 1996, when Scholle filed its complaint for patent infringement. Many of those contacts concerned the '354 patent which is the subject of this litigation. In particular, Blackhawk's Chairman had a continuous series of discussions with both the Chairman and the CEO of Scholle regarding Scholle's ongoing litigation with Cap Snap. These discussions related to pre-trial discovery as well as to the trial itself. Moreover, in the course of these conversations, Scholle was also kept informed of Blackhawk's changing position in the valved water bottle cap market. Scholle learned that Blackhawk's rapidly increasing sales of SAFEGARD™ caps had soon become far greater than Blackhawk's similarly declining sales of WATERSAFE™ caps. Indeed, Blackhawk's sales of the SAFEGARD™ cap grew from less than one million in 1993 to over thirty-one million for the first nine months of 1996. At one point, a possible merger was even considered. Yet, in all this time and throughout all these discussions, Scholle made no suggestion that it might consider the SAFEGARD™ cap to infringe the '354 patent.

During the almost three years between the April 1993 meeting in Chicago and the time Scholle filed its complaint, Blackhawk invested approximately $700,000 in tooling and machinery for manufacture of the SAFEGARD™ cap. Most of these investments were made towards the latter end of this period in 1995. Moreover, almost all of Blackhawk's sales of the SAFEGARD™ cap were made subsequent to the Chicago meeting. In fact, the district court found that only 1.25% of SAFEGARD™ sales were made prior to April 1993. Thus, when Scholle filed suit in early 1996 accusing Blackhawk of infringing the '354 patent, Blackhawk had already made considerable investments in manufacturing and marketing the SAFEGARD™ cap.

Scholle appeals the district court's grant of summary judgment to Blackhawk on grounds of equitable estoppel. The district court did not reach the issue of non-infringement which was also raised in Blackhawk's summary judgment motion.

## ANALYSIS

### I.

When reviewing a summary judgment ruling on an issue of equitable estoppel there are two parts to our review. We initially review *de novo* whether the district court erred in finding the existence of no genuine issue of material fact. The district court's finding of equitable estoppel is then reviewed under an abuse of discretion standard. *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1028, 22 USPQ2d 1321, 1325 (Fed.Cir.1992) (in banc); *Adelberg Labs., Inc. v. Miles, Inc.,* 921 F.2d 1267, 1274, 17 USPQ2d 1111, 1116 (Fed.Cir.1990). Here, we find no infirmity in the district court's determination that there was no genuine issue of material fact. Accordingly, we turn to the holding of equitable estoppel.

### II.

Equitable estoppel is an equitable defense to infringement and may serve as an absolute bar to a patentee's claim of infringement. *Aukerman,* 960 F.2d at 1041, 22 USPQ2d at 1335. This court has held:

Three elements must be established to bar a patentee's suit by means of equitable estoppel:

a. The patentee, through misleading conduct, leads the alleged infringer to reasonably infer that the patentee does not intend to enforce its patent against the alleged infringer. "Conduct" may include specific statements, action, inaction, or silence where there was an obligation to speak.

b. The alleged infringer relies on that conduct.

c. Due to its reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed with its claim.

*Id.* at 1028, 960 F.2d 1020, 22 USPQ2d at 1325. Under this standard, we conclude on these undisputed facts that it was not an abuse of discretion for the district court to hold that Scholle was equitably estopped from pursuing its infringement claim against Blackhawk.

Scholle's primary contention is that the first of the above elements was not properly established. In particular, Scholle argues that the district court erred by (i) according improper weight to Scholle's prior accusation of the WATERSAFE™ cap; (ii) not taking appropriate account of Scholle's ongoing litigation with Cap Snap; and (iii) finding equitable estoppel after a period of silence of only three-and-a-half years. We do not discern merit in any of these assertions.

Scholle's prior accusation of the WATERSAFE™ cap followed by its silence after being presented with the SAFEGARD™ cap was entirely relevant to the equitable estoppel analysis. For Blackhawk to derive an inference that it would not be sued for infringement was wholly reasonable given that Scholle's silence occurred in the face of Blackhawk openly touting the SAFEGARD™ cap as the design-around successor to the previously-accused WATERSAFE™ cap. This inference was only reinforced by the course of dealings between the parties following the Chicago meeting. When told by Blackhawk that Blackhawk would market the SAFEGARD™ cap unless Scholle informed Blackhawk that it considered the new cap to infringe its '354 patent, Scholle remained silent.[1] Moreover, despite numerous discussions about the Cap Snap litigation which concerned the '354 patent, not once did Scholle suggest that it had an intent to enforce its patent against Blackhawk. This cooperative behavior, in light of Scholle's previous threats to sue, created a reasonable inference that Scholle considered the SAFE-GARD™ cap a non-infringing design-around product and did not intend to sue.

■ That Scholle here had a duty to speak does not mean that patentees have a general duty to either grant patent infringement clearance or else sue any rival who so asks. Rather, when the course of dealings between a patentee and an alleged infringer is such that the alleged infringer reasonably infers from the patentee's misleading conduct or inaction that the patentee has waived its patent rights, then the first element of equitable estoppel has been established absent a statement to the contrary by the patentee. *See Aukerman,* 960 F.2d at 1028, 22 USPQ2d at 1325.

Scholle additionally asserts that the district court, referring to *Jamesbury Corp. v. Litton Industrial Products, Inc.,* 839 F.2d 1544, 5 USPQ2d 1779 (Fed.Cir.1988), mistakenly applied the doctrine of laches rather than estoppel and so declined to take proper account of the Cap Snap litigation. We do not read such error in the district court opinion and the district court's footnote reference to *Jamesbury* in this context was not reversible error. Indeed, the district court merely noted that the Cap Snap litigation was not cause for Scholle to be "excused from the delay"; furthermore, it fully took account of the "extensive contact" between the parties in its equitable estoppel determination. *Scholle,* slip op. at 3 n. 1. Thus, the district court's ruling was entirely in accord with our holding in *Aukerman,* 960 F.2d at 1044, 22 USPQ2d at 1337, that other litigation is a factor that can impact the defense of equitable estoppel provided that the alleged infringer is aware of such other litigation. Accordingly, we do not consider that the district court erred by taking into account Scholle's prior threat to sue Blackhawk, nor

---

1. Scholle now contends that any accusation of infringement would have led to Blackhawk seeking a declaratory judgment action and, because the Cap Snap litigation was still ongoing, Scholle would be faced with two simultaneous fronts of attack on the '354 patent. However, this argument is belied by the fact that, had Scholle simply sent Blackhawk a letter stating that it was unable or unwilling to offer an infringement opinion at this time and was not waiving any of its rights in the '354 patent, then Blackhawk would have been on notice that Scholle might bring a future infringement suit but there would be insufficient grounds for a declaratory judgment action. *See, e.g., SRI Int'l, Inc. v. Advanced Tech. Lab., Inc.,* 127 F.3d 1462, 1469–70, 44 USPQ2d 1422, 1427–28 (Fed.Cir.1997) (letter from patentee to potential infringer enclosing a copy of the patent, noting possible infringement and offering a nonexclusive license was sufficient notice for purposes of 35 U.S.C. § 287(a) but did not create an actual controversy under the Declaratory Judgment Act, 28 U.S.C. § 2201); *International Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1213, 206 USPQ 772, 777 (7th Cir.1980) (when patent owner refused to offer an opinion as to whether drawings submitted by competitor of a new product would infringe, no reasonable apprehension was created sufficient for a declaratory judgment action).

do we conclude that its analysis of the significance of the Cap Snap litigation was erroneous.

Scholle's assertion that the district court erred by holding that Scholle's three-and-a-half years of silence was sufficient to create equitable estoppel is similarly without merit. As an initial matter, while a presumption of laches arises when a patentee delays bringing suit for more than six years, "[n]o presumption is applicable to the defense of equitable estoppel." *Aukerman*, 960 F.2d at 1028, 22 USPQ2d at 1325. Thus, given misleading conduct, there is no reason why equitable estoppel could not arise in three-and-a-half years or even sooner. Furthermore, the conduct by the estopped party need not be affirmative misstatements. As we explained in *Aukerman*, " '[c]onduct' may include specific statements, action, inaction, or silence where there was an obligation to speak." *Id.* In any case, Scholle's conduct was not merely silence but also consisted of affirmative acts such as its prior threats to sue Blackhawk and its regular discussions about the Cap Snap litigation. Consequently, it was not an abuse of discretion for the district court to find that equitable estoppel had arisen in the three-and-a-half year period before Scholle brought suit.

Scholle finally argues that the element of reliance was not properly found because Blackhawk began selling SAFE-GARD™ caps prior to the April 1993 Chicago meeting and because Scholle did not obtain a written opinion of counsel regarding infringement until December 1993. However, because Blackhawk's sales of the SAFEGARD™ cap prior to April 1993 were only 1.25% of its total sales, this was little more than a test marketing which does not refute the finding of reliance. Similarly, Blackhawk's alleged tardiness in obtaining a formal written infringement opinion of counsel hardly suggests a lack of reliance nor, as Scholle suggests, is it evidence of willful infringement given the unrefuted evidence that the SAFEGARD™ cap was created as a design-around product and given Blackhawk's willingness to have Scholle examine samples of the device early in the production process.

## CONCLUSION

Because we find no abuse of discretion in the district court's determination that the circumstances presented here properly gave rise to equitable estoppel, we

*AFFIRM.*